ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
MARK J. WENKER
Assistant United States Attorney
Arizona State Bar Number 018187
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Mark.Wenker@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>$18,080.00 in United States Currency,<br><br>Defendant. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

**BASIS FOR FORFEITURE**

1. This is a civil action *in rem* to forfeit property pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.,* is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or is property involved in a money laundering transaction or attempted transaction.

2. This is a civil action *in rem* brought to forfeit property pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of, among other things, a specified unlawful activity and 18 U.S.C. § 1952, travel in interstate commerce to distribute the proceeds of, and promote or facilitate the promotion of, an unlawful activity.

3. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 18 U.S.C. § 981(h) and 28 U.S.C. §§ 1345 and 1355.

**DEFENDANT IN REM**

4. The Defendant consists of $18,080.00 in United States currency ("defendant currency") seized on September 19, 2017, from Patrick O'Neal Ivory, Jr. The defendant currency currently is in the custody of the Homeland Security Investigations.

**INTRODUCTION**

5. The Arizona High Intensity Drug Trafficking Area (HIDTA) Border Enforcement Security Task Force (BEST) has a HSI Phoenix Special Agent (SA) assigned to the Phoenix Police Department (PPD) Commercial Narcotics Interdiction Unit (CNIU) based out of the Phoenix Sky Harbor International Airport.

6. The HSI Phoenix SA works with the PPD Detectives at the CNIU during their day-to-day interdiction operations as well as serving as the HSI Phoenix point of contact for all passenger and cargo activities regarding the Phoenix Sky Harbor International Airport.

7. Among other things, the HSI Phoenix SA assists detectives of the CNIU to identify and interdict money couriers in an effort to disrupt Drug Trafficking Organizations (DTOs). Based upon experience of CNIU investigators and investigations across the country, it is common knowledge that cities in the mid-west and east coast are known demand locations for illicit drugs. States such as Arizona and California are

2

considered source locations due to their close proximity to the border of Mexico and established drug transportation routes. Person(s) involved in the illegal drug trade, often hire couriers to transport drugs and or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies. In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

8. Factors that constitute suspicious flight itineraries include, airfare purchase at the counter immediately prior to departure or short notice reservations for a one-way travel, sometimes paid in cash. In addition, it is common for couriers to utilize a third party credit card to purchase airfare and to provide inaccurate or not in-service telephone numbers to the airlines. Couriers travel with minimal or no luggage and will often attempt to board the aircraft at the last possible moment. Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

**BACKGROUND**

9. On September 18, 2017, while on duty at the CNIU located at the Phoenix Sky Harbor International Airport, HSI Special Agent Brian Derryberry (SA Derryberry) received information from the HSI Houston concerning an individual identified as Patrick O'Neal Ivory, Jr. (IVORY) who was in possession of approximately $10,000 in U. S. currency discovered by Houston Transportation Security Administration (TSA).

10. The TSA Agents in Houston contacted IVORY during the passenger screening and observed IVORY pull out several rubber-banded bundles of currency in his possession from his pants pockets.

11. IVORY stated that he had "$10,000 but the amount could be more."

12. IVORY claimed he was traveling to Los Angeles for his birthday and to go shopping.

13. TSA provided a physical description to SA Derryberry for IVORY and advised the currency was inside IVORY's pockets.

14. Prior to the arrival of the flight in Phoenix, investigators ran a criminal history check on IVORY.

15. A check of federal, state and local law enforcement indices revealed IVORY had previous charges on possession of marijuana.

16. SA Derryberry contacted the CNIU PPD Sergeant who was able to make arrangements for additional CNIU members to assist with identifying IVORY upon his arrival.

17. IVORY purchased his one-way ticket within 48 hours of the flight and had no checked luggage.

18. Based on the information received and their knowledge of the drug demand/source relationship between Houston and the southwest states, investigators decided to attempt to talk with IVORY.

19. IVORY was traveling on American Airlines flight #531 from Houston to Los Angeles, California, with a stop in Phoenix, Arizona.

20. Investigators approached the arrival gate and observed a male, consistent with an individual fitting IVORY's description, in the terminal talking on his cellular phone.

**Investigators' Contact with IVORY**

21. Investigators approached the male passenger believed to be IVORY, identified themselves, and showed him their official badges and credentials.

22. Investigators asked the individual if they could speak to him, and he agreed.

23. The individual ended his phone call and provided investigators with his boarding pass and Texas identification card in the name of Patrick O'Neal Ivory, Jr.

24. Investigators explained to IVORY the purpose of their contact and explained they received information from the Houston TSA that he was in possession of a large amount of currency.

25. Investigators inquired about IVORY's ticket purchase and his intended use of the currency.

26. IVORY stated he was traveling from Houston, Texas, to Los Angeles to shop for his birthday.

27. IVORY showed investigators his Texas identification and pointed out his birthday was in several days, September 22, 1993.

28. IVORY advised he had only one carry-on bag and denied traveling with illicit drugs or contraband.

29. IVORY stated he had a little over $10,000.

30. When investigators asked for the specific amount, IVORY then stated he had $12,000.

31. IVORY showed investigators several rubber-banded bundles of currency, which IVORY had pulled out from his pants pocket.

32. Investigators asked IVORY how he obtained the currency. IVORY responded he designed and sold clothes through his clothing line.

33. IVORY stated he intended on spending the currency on clothes for his birthday.

34. IVORY could not provide anything to corroborate how he obtained the currency.

35. IVORY did not have a wallet, driver's license, business card or any credit cards.

36. Although IVORY claimed he obtained the currency from selling clothes he designed, he did not have a bank account, personal or business.

5

37. IVORY stated he "does everything" through his mother, Cheryl Herron's (Herron) account.

38. IVORY told investigators his mother gave him at least $5,000 to spend and purchased his airline ticket because his birthday was coming up.

39. Based on the information received, investigators told IVORY they wanted to conduct a verification count of the currency as the amount he claimed to possess had changed several times.

40. Investigators advised IVORY they had more questions regarding the currency as IVORY initially claimed he had "around $10,000" and then claimed he had $12,000.

41. Investigators asked IVORY if they could continue the contact inside the CNIU office to conduct the count and have a narcotic canine examine the currency. IVORY agreed and carried his own bag.

42. IVORY denied the currency had been exposed to illicit drugs.

43. While walking to the CNIU office, IVORY showed investigators an Instagram account for his clothing line and said Herron's account was part of the company and handled all his money.

44. IVORY inquired about the ticket tip information, and investigators explained it varied in reasons from last minute ticket purchases, departure/arrival cities or how the ticket was purchased, and that in this instance, TSA notified CNIU.

45. While walking to the CNIU office, IVORY verified his personal information, mailing address and phone number.

46. IVORY stated he lived with his mother, Cheryl Herron, and his sibling.

47. IVORY did not pay rent, but had child expenses for his one-year old son.

**IVORY's Interview at CNIU Office**

48. Upon arrival at the CNIU office, IVORY was asked to place the contents of his pockets on the table.

6

49. IVORY withdrew from his pants pockets three rubber-banded bundles of currency, his Texas identification card, and a pre-paid debit card that IVORY stated he purchased at the last minute because the airline charged him extra to board the flight, although no explanation given as to why.

50. During a pat down, another rubber-banded bundle of currency was found inside IVORY's sweater-hoodie pocket and IVORY stated, "I forgot about that."

51. IVORY told investigators all the currency he possessed belonged to him.

52. When asked why the currency was separated into different bundles, IVORY stated he did not want to carry one large bundle in his pocket so he separated it.

53. IVORY stated he had a clothing business called Pimperelli, but did not know the business address or phone number.

54. A check of the Texas Office of the Comptroller and other databases revealed Pimperelli, LLC, was registered to Effani Alexander since December 17, 2016.

55. No other registered agents were listed for Pimperelli, LLC.

56. IVORY claimed they sold clothing via an Instagram account @pimperelli or www.pimperelli.com.

57. IVORY stated he started the business with "his boys" two or three years ago.

58. IVORY added that he was part of "LACEDFAMTX," a group he "RAPS and PROMOTES" music with.

59. Investigators again asked IVORY how much currency he was carrying and he replied, "Honestly, I didn't count it before I left."

60. IVORY stated he knew his larger bundle consisted of $5,000 and the smaller bundles were $1,000 or $2,000.

61. IVORY could not explain why the bundles were separated into those specific amounts.

62. IVORY told investigators he did not have a bank account because he used his mother's account.

7

63. IVORY had a Texas identification card rubber-banded to one of the currency bundles in his pocket.

64. Investigators asked IVORY how he obtained the currency. IVORY stated he saved up $12,000, his mother gifted him with $5,000, and $3,000 belonged to his friend "TJ."

65. IVORY did not know the last name or phone number of his friend TJ.

66. IVORY claimed TJ wanted "Yeezy" Shoes, designer Adidas tennis shoes by Kanye West, and they were not sold in Houston.

67. Investigators asked IVORY how he got paid for his clothing line if he did not have a bank account or an online payment system like PayPal or Apple Pay. IVORY stated he did "hand to hand sales" in the Houston area and "his boy" handled the shipping.

68. Investigators asked who actually owned Pimperelli. IVORY stated "Probably one of my other boys."

69. When asked the specific name of "his boys," IVORY stated "Effani."

70. When asked what Effani's last name was, IVORY did not know.

71. IVORY claimed the currency he had was "business money" obtained to purchase more merchandise in the garment district of Los Angeles.

72. When asked if the currency belonged to him (IVORY) or belonged to Effani, the business owner, IVORY stated it all belonged to him except the $3,000, which TJ gave him.

73. Investigators explained to IVORY they were trying to verify how he obtained the currency and it was strange he was in business with several people, but did not know their last names or contact numbers.

74. Investigators asked IVORY if he filed taxes and he initially stated "Yes," but then admitted Efanni actually filed taxes for Pimperelli.

75. IVORY claimed he gave "his boy" cash for Pimperelli merchandise and he (IVORY) sets a price and sells it himself.

8

76. IVORY stated he had been selling merchandise since the business was established and has earned over $30,000.

77. IVORY told investigators he had never personally filed taxes.

78. IVORY stated he did not have a hotel reservation and could not rent a vehicle in Los Angeles because he did not have a driver's license.

79. IVORY claimed when he arrived, he would just start calling friends unexpectedly until someone was available to pick him up from LAX.

80. IVORY told investigators he had several friends from Houston already in Los Angeles and he would just stay where they were staying, or get a hotel room.

81. IVORY could not tell investigators a specific area of Los Angeles he planned to stay or shop, but claimed his friends would drive him anywhere he needed to go.

82. IVORY later claimed his Houston-based friend "Mya Papaya" was visiting her friends in North Hollywood and he would just call her and stay at her friend's apartment unannounced.

83. IVORY stated he needed a lot of cash because California is expensive and he had girls and parties to spend money on.

84. When asked why he did not keep the currency in the bank until he needed it, IVORY stated he did not have a personal bank account and did not have access to the business account.

85. IVORY said he worked with Effani and is paid in cash.

86. IVORY said he "stashes" his money at his house and his mother also saves money for him.

87. Investigators asked IVORY if he withdrew the currency he was traveling with from the bank. IVORY stated they have their own money and stash it at the house, and they do not deposit all the cash into his mother's bank account.

9

88. IVORY stated his mother is a massage therapist.

89. IVORY had one carry-on bag, and gave consent for his carry-on bag to be searched.

90. During the search, several bundles of currency wrapped with rubber-bands were identified inside.

### Canine Examination

91. Raven is a two-year old black Labrador Retriever, trained and certified to detect the odors of marijuana, cocaine, heroin, and methamphetamine.

92. Raven is currently certified with the National Police Canine Association and last certified on January 23, 2017. Raven has been in service since November 2016. If at any time during the examination Raven smells one of the odors she is trained to detect, Raven will alert with an active alert at the area she smells the odor in and/or on. Detective Rodriguez is Raven's only handler. The search was conducted in the CNIU office area.

93. Prior to using Raven to conduct a sniff of the currency, Detective Rodriguez had Raven inspect and sniff the area in which the currency was to be placed.

94. During the initial inspection, Raven did not alert to any of the four odors she is trained to detect. Raven was then taken out of the room, taken to a different room and placed back in her kennel while investigators cleared the room.

95. Detective Blaylock and SA Derryberry then placed the currency found during the investigation, $18,080 in U.S. currency, in a table drawer inside the supervisor office that Raven had previously inspected.

96. Raven was then removed from her kennel and brought back into the examination room.

97. Detective Rodriguez gave Raven the command to conduct an inspection of the area in which the $18,080 in U.S. currency had been placed.

98. Raven began searching the items within the office and when she began searching the table drawer where the currency was placed, her tail began to wag at a rapid pace, her breathing increased, and she began to scratch at the drawer.

99. Detective Rodriguez recognized this behavior as a positive alert indicating Raven could smell one or more of the four odors she is trained to detect.

**IVORY's Continued Interview**

100. Detective Rodriguez advised IVORY his narcotic canine gave a positive alert on the currency.

101. IVORY stated he had not smoked marijuana in several months, then admitted he was recently put back on probation for failing a urine analysis.

102. IVORY claimed to not know his probation officer's full name or phone number, only stating her name was "Ms. Gregor or something like that."

103. IVORY stated other people around him smoke marijuana, including his mother.

104. Investigators asked IVORY again what the total amount of the currency he was traveling with was. IVORY stated $12,000 belonged to him and he was certain of the amount because he counted it before leaving Houston.

105. IVORY stated his mother gave him $5,000, but he did not count it and TJ gave him $3,000. IVORY then stated he should have between $17,000 and $18,000.

106. During the interview, IVORY gave several conflicting stories regarding the amount of U.S. currency he was traveling with, the purpose of travel, to whom the U.S. currency belonged, where the U.S. currency came from and what the U.S. currency was to be used for.

107. IVORY denied investigators consent to view the contents of his cell phone after they explained they wanted to look through his texts and pictures for drug sale activity, which could implicate or exculpate him.

108. A check of IVORY's cellular number XXX-XXX-9634 showed it is linked to the Facebook page "You Kno'It" Patrick Ivory.

11

109. A picture of IVORY with a large amount of $100 bills was posted on the page.

110. Investigators verified a total amount of $18,080 in U.S. currency.

111. Investigators advised IVORY the currency would be impounded pending an investigation.

112. The $18,080.00 in United States currency was seized on September 19, 2017.

### The J'Mulan Agency

113. On September 20, 2017, CNIU received an email from Jaleks Holman of The J'Mulan Agency, claiming IVORY is a full-time employee working as an event coordinator.

114. IVORY never mentioned his employment with The J'Mulan Agency during his contact with investigators.

115. Holman attached two paychecks listing IVORY's purported earnings, but the checks appeared to have been fabricated.

116. Research of The J'Mulan Agency revealed there was no tax identification number.

117. Research also revealed there were no business affiliations discovered for Jaleska Holman.

118. When investigators searched the address printed on the pay stub for J'Mulan Agency, 6009 Richmond Ave., Houston TX 77057, the J'Mulan Agency could not be found.

119. The address 6009 Richmond Ave., Houston TX 77057, was a large building with a couple of businesses.

120. Investigators could not find J'Mulan and asked the current tenants. The current tenants had never heard of J'Mulan.

121. The second address listed on the pay stub for J'Mulan Agency was 8795 Antoine Dr. #107, Houston TX 77057. Investigators visited this address which was occupied by "Barber School Student Barbers," but no J'Mulan was found or known.

### Claim filed by IVORY

122. On or about November 2, 2017, the United States Customs and Border Protection received a claim, dated October 30, 2017, from IVORY along with a cover letter from attorney Jennifer R. Grant, claiming IVORY was the legal and rightful owner of the $18,080 in U.S. currency.

### IVORY's Criminal History

123. IVORY has been arrested and/or charged with multiple offenses, including burglary, evading arrest, possession of marijuana and tampering/fabricating evidence. On or about July 22, 2015, IVORY was arrested by the Houston Police Department for Possession of Marijuana, 2 oz., was convicted on October 13, 2015, and was sentenced and fined.

124. On or about November 29, 2015, IVORY was arrested by the Houston Police Department in Texas for Tampering/Fabricating Physical Evidence and Possession of Marijuana 2 oz. IVORY was convicted on March 4, 2016, for Possession of Marijuana 2 oz., and sentenced and fined.

125. On or about November 6, 2016, IVORY was arrested by the Hempstead Police Department in Texas for Possession of Marijuana, 2 oz.

### Wage and Employment Investigation

126. Investigators ran a query of IVORY's employment history. Texas employment database showed no record of employment history for IVORY.

### IVORY's Flights to Los Angeles, CA

127. On July 27, 2017, IVORY flew from Los Angeles to Houston on flight #6038, a direct flight.

128. On August 25, 2017, IVORY flew from Houston to Los Angeles on flight #6064, a direct flight.

13

129.   On September 28, 2017, IVORY flew from Houston on flight #531 to Los Angeles with a stop in Phoenix, AZ.

130.   On September 19, 2017 (day after interdiction at Phoenix), IVORY flew on a return flight from Los Angeles to Houston on flight #6038.

131.   During his interview on September 18, 2017, IVORY stated he was traveling to Los Angeles to go shopping, visit some friends for a couple days and to celebrate his birthday on September 22, 2017.

132.   However, from the time IVORY landed in Los Angeles on September 18, 2017, at 3:34 p.m. to the time he departed Los Angeles on September 19, 2017, IVORY was in Los Angeles a total of 27 hours and 6 minutes, contradicting IVORY's statement regarding the purpose and scheduled time of his travel.

### Demand/Source Relationship

133.   A demand/source relationship exists between Houston, Texas, and southwest states relating to the distribution of illegal drugs. Drug money couriers commonly travel from the states such as Texas to Arizona and California for the purpose of transporting currency intended to be used to purchase illicit drugs.  Due to its close proximity to the U.S./Mexico border, Phoenix and Los Angeles are supply locations for the distribution of illegal drugs throughout the United States.

### Seizure of Currency

134.   The following represents a breakdown of the $18,080 in U.S. currency carried by IVORY:

| **Number of Bills** | **Denomination** | **Amount** |
|---|---|---|
| 65 | $ 100.00 | $  6,500.00 |
| 4 | $  50.00 | $     200.00 |
| 540 | $  20.00 | $ 10,800.00 |
| 58 | $  10.00 | $     580.00 |
| **Total:** | | **$ 18,080.00** |

135.   Twenty dollar bills are the most common denomination of currency used by drug traffickers and those who launder the proceeds of drug trafficking.

136.   Moreover, the defendant currency was bundled in a manner that is similar to how drug traffickers routinely bundle their drug proceeds.

**FIRST CLAIM FOR RELIEF**

The defendant currency was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, or is property involved in a money laundering transaction or attempted transaction and therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6).

**SECOND CLAIM FOR RELIEF**

The defendant currency constitutes or is derived from proceeds traceable to a violation of, among other things, a specified unlawful activity and travel in interstate commerce to distribute the proceeds of, and promote or facilitated the promotion of, an unlawful activity and therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant currency; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant currency be forfeited to the United States of America for

/ / /

/ / /

disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

DATED this 24th day of January, 2018.

                                          ELIZABETH A. STRANGE
                                        First Assistant United States Attorney
                                        District of Arizona

                                        *S/ Mark J. Wenker*
                                        MARK J. WENKER
                                        Assistant United States Attorney

# **VERIFICATION**

I, Brian Derryberry, verify and declare under penalty of perjury that, I am a Special Agent with the United States Homeland Investigations, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents, and that the matters contained in the Complaint are true to my own knowledge, except that those matters alleged upon information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I verify and declare under penalty of perjury that the foregoing is true and correct. Executed on this 23rd day of January, 2018.

_____
Brian Derryberry, Special Agent
United States Homeland Investigations

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

**Plaintiff(s):** United States of America

**Defendant(s):** $18,080.00 in United States Currency

County of Residence: Maricopa

County of Residence: Maricopa

County Where Claim For Relief Arose: Maricopa

Plaintiff's Atty(s):

**Mark J. Wenker, Assistant United States Attorney**
**United States Attorney's Office**
**40 N Central Ave., Ste. 1800**
**Phoenix, Arizona 85004-4408**
**602-514-7500**

Defendant's Atty(s):

II. Basis of Jurisdiction:   1. U.S. Government Plaintiff

III. Citizenship of Principal
Parties (Diversity Cases Only)
            Plaintiff:- N/A
            Defendant:- N/A

IV. Origin :        1. Original Proceeding

V. Nature of Suit:  625 Drug Related Seizure of Property 21 USC 881

VI. Cause of Action:   Forfeiture of property to the U.S. pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(A), and 18 U.S.C. § 981(a)(1)(C).

VII. Requested in Complaint
        Class Action: **No**
        Dollar Demand: **$18,080.00**

Jury Demand: **No**

VIII. This case **is not related** to another case.

---

**Signature:** S/ Mark J. Wenker

**Date:** 01/24/2018

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.

Revised: 01/2014